## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| TRANSWITCH CORPORATION | : CASE NO. 13-51829-ahws |
| DEBTOR | : |
| | : RE:   DOC. ID # _70 |

## ORDER (A) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) AUTHORIZING AND APPROVING PURCHASE AGREEMENT THERETO; (C) AUTHORIZING THE USE, LICENSE AND LEASE OF PROPERTY OF THE ESTATE IN CONNECTION THEREWITH; (D) AUTHORIZING THE DEBTOR'S EXERCISE OF CORPORATE GOVERNANCE RIGHTS; AND (E) GRANTING RELATED RELIEF

Upon consideration of the motion (the "**Sale Motion**")[1] of Ronald I. Chorches, chapter 7

Trustee appointed in the above-captioned chapter 7 case (the "**Trustee**"), on behalf of

TranSwitch Corporation (the "**Debtor**"), for entry of an order (this "**Order**"), pursuant to

sections 105(a), 363(b), 363(f), 363(m), and 363(n) of title 11 of the United States Code, 11

U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), and rules 2002, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing and approving, among

other things:

1) The sale, conveyance, transfer, assignment and delivery of all of the Debtor's right,

   title and interest in and to the Transferred Assets (the "**Debtor Transferred Assets**"),

   free and clear of Interests[2] to Cadence Design Systems, Inc., or one or more of its

---

[1] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Sale Motion.

[2] For purposes of this Order, "**Interest**" shall mean (i) any charge against or interest in any of the Debtor Transferred Assets to secure payment of a debt or performance of an obligation, any mortgage, deed of trust, interest, pledge, hypothecation, attachment, levy, charge, security interest, conditional sale agreement, title retention contract, right of first refusal, option to purchase, encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and other consensual or non-consensual

affiliates or designees (collectively, the "**Purchaser**"), pursuant to an Asset Purchase Agreement, a substantially final form of which is attached hereto as Exhibit 1 and incorporated herein (together with all schedules, exhibits, annexes and supplements, and as may be amended from time to time in accordance with this Order, the "**Purchase Agreement**"), between the Trustee, on behalf of the Debtor, and the Purchaser;

2)  The Trustee's entry into and consummation of the Purchase Agreement and a Patent License Agreement, a substantially final form of which is attached hereto as Exhibit 2 and incorporated herein (together with all schedules, exhibits, annexes and supplements, and as may be amended from time to time in accordance with this Order, the "**License Agreement**," and together with the Purchase Agreement, the "**Transaction Documents**") between the Trustee, on behalf of the Debtor, and the Purchaser;

3)  To the extent required under applicable non-bankruptcy law, the Trustee's exercise, on behalf of the Debtor, as the ultimate parent of TranSwitch (Israel) Ltd. (the "**Subsidiary**"), of its corporate governance and voting rights and powers to cause the Subsidiary, acting through its Temporary Liquidator, Lior Dagan (the "**Temporary Liquidator**" and, together with the Trustee, the "**Seller Parties**") (a) to sell, convey, transfer, assign and deliver all of the Subsidiary's right, title and interest in and to the Transferred Assets upon approval thereof by the Israeli Court, and (b) to enter into and consummate an Asset Purchase Agreement, a substantially final form of which is

---

lien or charge of any kind, whenever granted and including those charges or interests in property within the meaning of "lien" under Bankruptcy Code § 101(37) (a "**Lien**"), (ii) any "claim" within the meaning set forth in section 101(5) of the Bankruptcy Code (a "**Claim**") or (iii) any other limitation, restriction or interest that constitutes an "interest" for the purposes of section 363(f) of the Bankruptcy Code; *provided, however,* that Interests shall not include any Permitted Encumbrances as defined in the Purchase Agreement.

attached hereto as Exhibit 3 (together with all schedules, exhibits, annexes and supplements, and as may be amended from time to time, the "**Subsidiary Purchase Agreement**" and together with any further agreements appurtenant thereto, the "**Subsidiary Transaction Documents**") upon approval thereof by the Israeli Court; and

4) To the extent required under applicable non-bankruptcy law, the Trustee's exercise, on behalf of the Debtor, of its corporate governance and voting rights and powers to cause each and every other subsidiary or other affiliate (each, an "**Other Affiliate**") to convey, transfer, assign and deliver, without additional consideration from Debtor beyond the Purchase Price, all of the Other Affiliate's right, title and interest in and to the Transferred Assets or any intellectual property rights thereto, if any, and perfect Debtor's title in same;

(the foregoing (1) through (4) collectively being referred to herein as the "**Sale**" or the "**Transaction**"); a competitive marketing process having been conducted with respect to the Transferred Assets, and the Purchaser having been chosen as having the highest and best offer for the Transferred Assets; and this Court having conducted a hearing approving the Sale on January 28, 2014 (the "**Sale Hearing**"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the Transaction, the Transaction Documents, the Subsidiary Transaction Documents, and all other relief granted herein; and this Court having determined that the consummation of the Transaction and the other relief granted herein is in the best interests of the Debtor, its estate, its creditors and other parties in interest; and upon consideration of the Transaction Documents, the Subsidiary Transaction Documents, the *Declaration of Ronald I. Chorches in Support of the Sale Motion* [Docket No. 70, Part 2] (the

3

"**Sale Declaration**"); and upon consideration of the arguments of counsel, the record made at the Sale Hearing, and the record of this chapter 7 case; and the Court having reviewed and considered the Sale Motion; and after due deliberation thereon, and good and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

## Jurisdiction and Statutory Predicates

A. This Court has jurisdiction over the Sale Motion, the Transaction Documents and any other documents and agreements related thereto pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the above-captioned case and the Sale Motion in this Court and this District is proper under 28 U.S.C. §§ 1408 and 1409.

B. This Order is intended to be a final and appealable order as set forth in 28 U.S.C. § 158(a).

C. Notwithstanding Bankruptcy Rule 6004(h), this Court finds that there is no reason for delay in the implementation of this Order, and directs entry of this Order as set forth herein.

D. The statutory predicates for the relief sought in the Sale Motion are sections 105(a), 363(b), 363(f), 363(m), and 363(n) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 9014.

## Notice of the Sale Process

E. As demonstrated at the Sale Hearing and as evidenced by the affidavit of service filed with this Court [Docket No. 75] and the *Order Shortening the Notice Period* with respect to

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4

the Sale Motion [Docket No. 72], proper, timely, adequate and sufficient notice of and sufficient opportunity to object to the Sale Motion, the Sale, and to the relief to be granted in this Order, has been provided in accordance with the Bankruptcy Rules and the orders of this Court.

F.       No further or other notice shall be required in connection with the relief provided in this Order.

## Marketing Process

G.       As evidenced by the Sale Declaration, the Trustee, both independently and in concert with the Temporary Liquidator, conducted a competitive marketing process and exercised sound business judgment, consistent with his fiduciary duties, in conducting the marketing process and selecting the Purchaser as having the highest and otherwise best offer.

H.       The Trustee, both independently and in concert with the Temporary Liquidator, marketed the Transferred Assets and conducted the marketing and sale process as described in the Sale Motion and the Sale Declaration. These processes were conducted upon fair and reasonable terms calculated to achieve the highest and best value for the Debtor, its estate, the Subsidiary, each of their respective creditors, and all other parties in interest.

I.       All creditors and other parties in interest and all potential purchasers have been afforded a reasonable and fair opportunity to make an offer for the Transferred Assets. No further marketing of the Transferred Assets is necessary or likely to lead to any higher and better offers for the Transferred Assets than that submitted by Purchaser, as reflected in the Transaction Documents and the Subsidiary Transaction Documents.

J.       The marketing process was substantively and procedurally fair to all parties, including all potential purchasers. The Seller Parties, (a) undertook substantial marketing efforts and conducted the sale process without collusion, (b) afforded interested potential purchasers a

5

full, fair and reasonable opportunity to submit their highest or otherwise best offer to purchase the Transferred Assets, (c) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to make an offer on the Transferred Assets, and (d) considered any offers submitted in a timely manner.

## Sound Business Purpose

K.        There are sound business reasons for the Debtor, pursuant to section 363(b) of the Bankruptcy Code, to consummate the Transaction, as justified by the compelling circumstances described in the Sale Motion and Sale Declaration. The Seller Parties and their advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Transferred Assets and determined that (a) the terms and conditions set forth in the Transaction Documents and the Subsidiary Transaction Documents, and (b) the Purchase Price agreed to in the Purchase Agreement and the Subsidiary Purchase Agreement, are all fair and reasonable and together constitute the highest or otherwise best value obtainable for the Transferred Assets.

## Good Faith Finding

L.        The Purchaser is not an "insider" or "affiliate" of the Debtor as those terms are defined in section 101 of the Bankruptcy Code.

M.        The Transaction Documents and Subsidiary Transaction Documents were negotiated, proposed and entered into by the Seller Parties and the Purchaser without collusion or fraud, in good faith and from arm's-length bargaining positions.

N.        Neither the Seller Parties nor the Purchaser has engaged in any conduct that would cause or permit the Transaction to be avoidable under section 363(n) of the Bankruptcy Code.

O.     The Purchaser is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. In particular, (a) the Purchaser recognized that the Trustee was free to deal with any other party interested in acquiring the Transferred Assets; (b) the Purchaser agreed to subject its offer to the competitive marketing process established by the Seller Parties and otherwise complied with the terms of such process; (c) the Purchaser in no way induced or caused the chapter 7 filing by the Debtor or the insolvency proceeding by the Subsidiary; (d) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (e) no common identity of directors and officers exist between the Purchaser and the Debtor.

## No Fraudulent Transfer or Successor Liability

P.     The total consideration provided by the Purchaser pursuant to the Transaction Documents and the Subsidiary Transaction Documents: (a) is fair and reasonable; (b) is the highest and best offer for the Transferred Assets and the rights and commitments bargained for in the Transaction Documents and the Subsidiary Transaction Documents; (c) will provide a greater recovery to creditors than would be provided by any other available alternative; and (d) constitutes reasonably equivalent value (as that term is defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code). The consideration provided by the Purchaser pursuant to the Transaction Documents also constitutes fair consideration and fair value for the Debtor Transferred Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and other similar laws of the United States. No other person, entity, or group of persons or entities has offered to purchase or acquire the Transferred Assets for greater economic value than the Purchaser. The Seller Parties' determinations that the Transaction

7

constitutes the highest and best offer for the Transferred Assets were valid, sound, and reasonable exercises of business judgment.

Q.      None of the Transaction Documents or the Subsidiary Transaction Documents have been entered into for the purpose of hindering, delaying or defrauding creditors. None of the Seller Parties or the Purchaser has entered into the Transaction Documents or the Subsidiary Transaction Documents with any fraudulent or otherwise improper purpose.

R.      The Purchaser is not a mere continuation of or successor to the Debtor in any respect, and there is no continuity of enterprise between the Debtor or the Purchaser. The Purchaser is not purchasing all or substantially all of the Debtor's assets. The Purchaser is not a successor to the Debtor or its estate and the Transaction does not amount to a consolidation, merger, or *de facto* merger of the Purchaser and the Debtor.

S.      The Purchase Agreement provides for (i) an allocation of the proceeds of the Purchase Price among the Seller Parties in accordance with this Court's *Order on Trustee's Motion for Authority to Compromise Claim* [Docket No. 93] (the "**Purchase Price Allocation Order**"), and (ii) an allocation of the OCS Expense pursuant to the methodology set forth in the Purchase Agreement (such allocations, collectively, the "**Purchase Price Allocation**"). The Purchase Price Allocation provides reasonably equivalent value to each of the Seller Parties in exchange for their respective contributions and commitments to the Transaction.

## Validity of Transfer and Authorizations

T.      The Trustee, on behalf of the Debtor, has full corporate power and authority to execute and deliver the Transaction Documents, and all other documents contemplated thereby, and has all corporate authority necessary to consummate the Transaction, including the authority to cause the Subsidiary and the Other Affiliates to consummate the Transaction. No consents or

8

approvals, other than the approval of the Israeli Court of the Subsidiary Transaction Documents and those expressly provided for in the Transaction Documents, are required for the Debtor to consummate the Transaction.

U.      The appointment of a consumer privacy ombudsman pursuant to sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the relief requested in the Sale Motion.

## Section 363(f) Requirements Satisfied for Free and Clear Sale

V.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full. At the closing of the Sale, the transfer of the Debtor Transferred Assets to the Purchaser will be a legal, valid, and effective transfer of such assets, and in the case of the Debtor Transferred Assets, shall vest the Purchaser with all right, title and interest of the Debtor in and to such assets free and clear of any and all Interests.

W.      Upon entry of this Order, the Trustee is authorized to sell all of its right, title and interest in and to the Debtor Transferred Assets free and clear of all Interests because one or more of the provisions set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied, including that, except as otherwise expressly provided in the Purchase Agreement or this Order, such Interests shall attach to the proceeds of the Sale allocated to the Debtor under the Purchase Price Allocation in the order of their priority, with the same validity, force, and effect which they now have against the Debtor Transferred Assets, subject to any claims and defenses the Debtor may possess with respect thereto. Those holders of Interests against the Debtor Transferred Assets who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

X.     In the case of the Debtor Transferred Assets, if the sale of such assets were not free and clear of all Interests as set forth in the Purchase Agreement and this Order, or if the Purchaser would, or in the future could, be liable for any of such Interests, the Purchaser would not have entered into the Purchase Agreement and would not consummate the Transaction, thus adversely affecting the Debtor, its estate, its creditors and its stakeholders.

Y.     The Purchaser is providing substantial consideration under the Transaction Documents for the benefit of the Debtor and its creditors.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of Interests against the Debtor Transferred Assets pursuant to this Order, which releases shall be deemed to have been given in favor of the Purchaser with respect to the Debtor Transferred Assets by all holders of Interests against such assets.

## Best Interest of Creditors

Z.     The legal and factual bases set forth in the Sale Motion, the Sale Declaration and the record in these proceedings establish just cause for the relief requested in the Sale Motion, and such relief is in the best interests of the Debtor, its creditors, its estate and all parties in interest; and therefore;

IT IS HEREBY ORDERED THAT:

1.     The Sale Motion is GRANTED, and the Transaction is APPROVED, as set forth herein.

2.     All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, settled or otherwise resolved, and all reservations of rights included therein, are hereby overruled on the merits, with prejudice.  All persons and entities that failed to timely object to the Sale Motion are deemed to have consented to the relief granted herein.

10

## Approval of the Transaction Documents

3.      Pursuant to sections 105 and 363 of the Bankruptcy Code, the Purchase Agreement and the other Transaction Documents, all transactions contemplated therein and all terms and conditions of the Purchase Agreement and the other Transaction Documents, are hereby APPROVED.

4.      The allocation of the Purchase Price among the Seller Parties satisfies the terms of the Purchase Price Allocation Order, and the Purchase Price Allocation, including, without limitation, the allocation of the OCS Expense, is hereby APPROVED.

5.      The Trustee is authorized: (a) to execute, deliver and perform under, consummate and implement the Purchase Agreement and the other Transaction Documents, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the other Transaction Documents; (b) to take and perform all other actions necessary or desirable to consummate or implement the Transaction and implement and effectuate the relief granted in this Order and (c) to take all further actions as may be (i) reasonably requested by the Purchaser for the purpose of selling, assigning, delivering, granting, conveying and conferring to the Purchaser, or reducing to possession, the Debtor Transferred Assets in accordance with the Transaction Documents, or (ii) necessary or appropriate for the performance of the obligations and commitments contemplated by the Purchase Agreement and the other Transaction Documents all without further order of the Court.

6.      To the extent required by applicable non-bankruptcy law, the Trustee, acting on behalf of the Debtor, as the ultimate parent of the Subsidiary, is hereby authorized to exercise all rights, powers and privileges necessary to cause the Subsidiary, through the Temporary Liquidator (a) to sell, convey, transfer, assign and deliver all of the Subsidiary's respective right,

11

title and interest in and to the Subsidiary Transferred Assets to the Purchaser pursuant to the Subsidiary Purchase Agreement, and (b) to enter into and consummate the Subsidiary Transaction Documents upon approval of the Israeli Court.

7. To the extent required under applicable non-bankruptcy law, the Trustee, acting on behalf of the Debtor, is hereby authorized to exercise all of its corporate governance and voting rights and powers to cause each and every Other Affiliate to convey, transfer, assign and deliver, without additional consideration from Debtor beyond the Purchase Price, all of the Other Affiliate's right, title and interest in and to the Transferred Assets or any intellectual property rights thereto, if any, and perfect Debtor's title in same.

## Transfer of Assets Free and Clear and Injunction

8. Upon the closing of the Transaction, the Sale to the Purchaser (a) shall constitute a legal, valid and effective transfer of all of Debtor's right, title and interest in and to the Debtor Transferred Assets subject to and in accordance with the Purchase Agreement and (b) shall vest the Purchaser with all of the Debtor's right, title, and interest in and to the Debtor Transferred Assets free and clear of all Interests, including, without limitation, any successor liability claims or theories pursuant to section 363(f) of the Bankruptcy Code, with such Interests attaching to the proceeds allocated to the Debtor under the Purchase Price Allocation in the order of their priority, with the same validity, force and effect which they now have against the Debtor Transferred Assets, subject to any claims and defenses the Debtor may possess with respect to such Interests. Except as expressly set forth in the Purchase Agreement or this Order, Purchaser, its successors and assigns shall have no liability for any Interest.

9. By virtue of the Transaction, the Purchaser, its successors and assigns shall not be deemed to: (a) be a legal successor, or otherwise be deemed a successor to the Debtor; (b) have,

12

*de facto* or otherwise, merged with or into the Debtor; or (c) be a mere continuation or substantial continuation of the Debtor or the enterprise or operations of the Debtor.

10.     All persons or entities holdings Interests in, to or against the Debtor or the Debtor Transferred Assets shall be, and hereby are, forever barred, to the extent permitted under applicable law, from asserting such Interests (or enforcing related remedies, or commencing or continuing in any manner any related action or other proceeding of any kind) against the Purchaser, its successors and assigns with respect to the Debtor Transferred Assets, or against such Debtor Transferred Assets after the closing of the Transaction, except as expressly provided in the Purchase Agreement. Notwithstanding the preceding sentence, nothing in this Order shall bar, restrain or enjoin any party to any of the Transaction Documents from enforcing such Transaction Documents.

11.     Notwithstanding anything to the contrary contained herein, Bridge Bank, N.A. (the "**Bank**") shall have a first lien on any and all proceeds from the sale of the Debtor Transferred Assets, and the Trustee is hereby authorized and directed to pay such proceeds to the Bank within two (2) business days of receipt by the Trustee until such time as the Bank's claim is indefeasibly paid in full.

## Additional Provisions

12.     Following the closing of the Transaction, a certified copy of this Order may be filed and/or recorded with the appropriate filing agents, filing officers, administrative agencies or units (including the U.S. Patent and Trademark Office and similar patent agencies of any jurisdiction), governmental departments, secretaries of state, federal, state and local officials and all other persons, institutions, agencies and entities who may be required by operation of law, the

13

duties of their office or contract evidencing the release, cancellation and termination provided herein of any Interests of record on the Debtor Transferred Assets.

13.    If any person or entity that has filed statements or other documents or agreements evidencing Interests in the Debtor Transferred Assets shall not have delivered to the Trustee before the closing of the Transaction, after due demand therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests that such person or entity has or may assert with respect to the Debtor Transferred Assets, the Trustee (on behalf of the Debtor) and the Purchaser are each hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Debtor Transferred Assets without any further order of this Court, and such person or entity is hereby deemed to authorize the same.

14.    The terms and provisions of the Transaction Documents and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Purchaser, its affiliates, the Trustee, the Debtor, the Debtor's estate, and each of their respective successors and assigns and all such terms and provisions and this Order shall be binding in all respects upon all holders of Interests in the Debtor Transferred Assets. Notwithstanding anything to the contrary contained herein, any other order in this bankruptcy case shall not conflict with, supersede, abrogate, nullify or restrict this Order, the Purchase Agreement, any of the Transaction Documents or the Transaction. Following the closing of the Transaction, neither the Debtor nor the Trustee shall assign, transfer, amend, modify, reject, or terminate any of the Transaction Documents (except as may be expressly permitted otherwise therein).

15.     Following the closing of the Transaction, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Debtor's right, title and interest in the Debtor Transferred Assets to the Purchaser subject and pursuant to the terms of the Transaction Documents, free and clear of all Interests, as provided in the Purchase Agreement, the other Transaction Documents and this Order.

16.     Notwithstanding anything set forth herein, the Purchaser shall acquire a worldwide, perpetual, irrevocable, fully paid up, royalty-free non-exclusive, assignable, sublicensable license under the Licensed Patents (as defined in the License Agreement) subject to the terms of the License Agreement. The License Agreement between the Debtor and the Purchaser will be, as of the closing of the Transaction, a legal, valid, and effective license, and shall vest the Purchaser with the rights as set forth therein.

17.     The Transaction has been undertaken by the Purchaser in good faith. The Purchaser satisfies the good faith requirement of section 363(m) of the Bankruptcy Code and, accordingly, the Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

18.     The Transaction may not be avoided and no damages may be awarded under section 363(n) of the Bankruptcy Code. The Transaction shall not be subject to avoidance under chapter 5 of the Bankruptcy Code. The Transaction Documents shall not be subject to rejection under section 365 of the Bankruptcy Code.

19.     Except as otherwise provided in the Purchase Agreement, any and all Debtor Transferred Assets in the possession or control of any person or entity shall be transferred to the Purchaser free and clear of all Interests as provided in the Purchase Agreement and this Order.

20.     The Transaction Documents and any related agreements, documents, or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of the Court. The Trustee is authorized to perform each of its covenants and undertakings as provided in Transaction Documents prior to or after the closing of the Sale without further order of the Court.

21.     The Transaction shall be of full force and effect, regardless of the Debtor's lack of good standing in any jurisdiction in which the Debtor is formed or authorized to transact business.

22.     No bulk sales law or any similar law of any state or other jurisdiction shall apply to the Debtor's conveyance of the Debtor Transferred Assets.

23.     In the event there is a direct conflict between this Order and the Purchase Agreement, this Order shall control.

24.     The failure specifically to include or make reference to any particular provisions of the Transaction Documents in this Order shall not impair the effectiveness of such provision, it being the intent of this Court that the Transaction Documents are authorized and approved in their entirety.

25.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

26.     The stay otherwise imposed by Bankruptcy Rule 6004(h) is hereby waived. This Order is immediately effective and enforceable, notwithstanding anything set forth in the Bankruptcy Rules or otherwise. The Debtor and the Trustee are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order and the Trustee may, without further delay, take all actions and perform all acts authorized under this Order.

16

27.     The Purchaser is not and will not become obligated to pay any fee, commission, or like payment to any broker, finder, or financial advisor as a result of the consummation of the Transaction contemplated by the Transaction Documents based upon any arrangement made by the Trustee on its own behalf or on behalf of the Debtor.

28.     This Court retains jurisdiction with respect to all matters arising from or related to the enforcement of this Order, including the authority to interpret, implement, and enforce the terms and provisions of this Order.

Dated: January 31, 2014

**By the Court**

*Alan H. W. Shiff*
Alan H. W. Shiff
**United States Bankruptcy Judge**

## Exhibit 1

## Purchase Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of January __, 2014 (this "Agreement"), is made and entered into by and between Ronald I. Chorches, in his capacity as Chapter 7 Bankruptcy Trustee (the "Seller" or "Trustee") of, and on behalf of, TranSwitch Corporation, a Delaware corporation (the "Debtor"), and Cadence Design Systems, Inc., a Delaware corporation ("Purchaser"). Seller and Purchaser are sometimes herein referred to collectively as the "Parties" and individually as a "Party". All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

## WITNESSETH:

WHEREAS, the Debtor is a global provider of telecommunications technology and highspeed interface technology;

WHEREAS, in connection therewith, the Debtor engaged in the business of high-speed interface technology, including the design, development, marketing, sale, distribution, research and other exploitation of intellectual property designs, including IP cores, firmware, design tools, and other software, and services that relate thereto, in each case in connection with the high speed interface technology business, and including but not limited to HDMI, DisplayPort, MHL, and Gigabit and other Ethernet IP technology (the "HSI Business"), and the design and sale of telecommunications products (the "Telecom Business") (as used herein, "includes" and its derivatives means "includes without limitation");

WHEREAS, the Debtor has commenced a Chapter 7 case ( the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division (the "Bankruptcy Court") and the Purchased Assets (as defined below) will be sold by the Seller "as is, where is" without representation or warranty, express or implied, including without representation of marketability and/or fitness for any particular purpose, except as expressly set forth otherwise in this Agreement, and all pursuant to applicable U.S. bankruptcy rules and regulations (the "Bankruptcy Code") and, in accordance therewith, an order of the Bankruptcy Court approving such sale (the "Bankruptcy Sale Order");

WHEREAS, the Trustee was appointed Chapter 7 trustee of the Debtor in the Bankruptcy Case on or about November 21, 2013.

WHEREAS, the Parties, as well as a subsidiary of the Debtor, TranSwitch (Israel) Ltd. (the "Israel Subsidiary") signed a letter agreement dated December 19, 2013 proposing, among other things, that Seller and Purchaser enter into an agreement for the purchase of assets related to the HSI Business, contingent upon approval of the Bankruptcy Court and other factors (the "Letter of Intent");

WHEREAS, the Israel Subsidiary is subject to liquidation proceedings (the "Israel Proceeding") in the Tel-Aviv – Jaffa District Court of Israel pursuant to The Companies Ordinance [revised version 1983];

WHEREAS, Purchaser and the Israel Subsidiary are, substantially concurrently herewith, entering into an asset purchase agreement for Purchaser to acquire assets of the Israel Subsidiary related to the HSI Business (the "Israel APA");

WHEREAS, on the terms and subject to the conditions hereinafter set forth and subject to the Bankruptcy Sale Order, the Parties desire to enter into this Agreement pursuant to which, among other things, Seller shall sell and transfer to Purchaser, and Purchaser shall purchase and acquire from Seller, all of Seller's right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I – PURCHASE AND SALE

**Section 1.1 Purchase and Sale of Assets**. Pursuant to applicable provisions of the Bankruptcy Code, the Bankruptcy Sale Order and on the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Purchaser (or its designee(s)), and Purchaser (or its designee(s)) shall purchase, acquire and accept from Seller, free and clear of any and all Interests to the maximum extent permitted under applicable laws, all of Seller's right, title and interest in, to and under any and all of the assets, personal properties, rights and claims of any kind or nature, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of the Debtor, which are used or useful in or held for use in connection with the operation of the HSI Business, excluding only the Excluded Assets expressly identified in Section 1.2 (such assets, properties, rights and claims to be acquired hereunder, including the assets set forth in Exhibit A attached hereto, collectively referred to herein as the "Purchased Assets"). For purposes herein: (a) "Interest(s)" means any (i) mortgage, deed of trust, interest, pledge, hypothecation, attachment, levy, charge, security interest, conditional sale agreement, title retention contract, right of first refusal, option to purchase, encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and other consensual or non-consensual lien or charge of any kind, whenever granted and including those charges or interests in property within the meaning of "lien" under Bankruptcy Code § 101(37), (ii) any "claim" within the meaning set forth in section 101(5) of the Bankruptcy Code, or (iii) any other limitation, restriction or interest that constitutes an "interest" for the purposes of section 363(f) of the Bankruptcy Code; but excluding any Permitted Encumbrances; and (b) "Permitted Encumbrances" means any rights of any third party to Intellectual Property in the Purchased Assets under section 365(n) of the Bankruptcy Code, if any.

**Section 1.2 Excluded Assets**. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. For purposes herein, "Excluded Assets" shall mean only the following assets: (a) the assets under Seller's business relating to the sale of integrated circuits or any related services, including, for the avoidance of doubt, any inventory of integrated circuits or any contracts under which Seller sells integrated circuits or related services to third parties, but excluding assets that constitute Intellectual Property necessary to conduct the HSI Business, (b) the assets under Seller's business relating to the Telecom Business or any related services, including, for the avoidance of doubt, any inventory or contracts related thereto and any equipment or machinery related thereto, but excluding assets that constitute Intellectual Property necessary to

2

conduct the HSI Business, (c) any claims which the Trustee can assert pursuant to Chapter 5 of the Bankruptcy Code, and (d) the Trustee's rights to collect accounts receivables of the Debtor.

**Section 1.3 Assumption of Liabilities**. The Purchased Assets are being sold free and clear of any and all Interests pursuant to section 363(f) of the Bankruptcy Code except to extent of the Permitted Encumbrances (the "Assumed Liabilities") but are being sold "as is – where is," without representation or warranty, express or implied, including without representation of marketability and/or fitness for a particular purpose, other than as expressly set forth otherwise in this Agreement. For purposes herein, "Liabilities" means any and all past income and other taxes related to the Seller, all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations, of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

**Section 1.4 Excluded Liabilities**. Notwithstanding anything to the contrary in this Agreement, the Parties expressly acknowledge and agree that Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of Seller or of any predecessor or Affiliate of Seller, existing on the Closing Date or arising thereafter, other than the Assumed Liabilities. All of the Liabilities of Seller or of any predecessor or Affiliate of Seller not specifically and expressly assumed by Purchaser pursuant to Section 1.3 shall be referred to herein collectively as the "Excluded Liabilities." For purposes herein, "Affiliate" of a party means any person or entity that directly or indirectly controls, is controlled by, or is under common control with such party, where "control" means ownership of fifty percent (50%) or more of the outstanding voting securities but only as long as such person or entity meets these requirements.

**Section 1.5  Further Conveyances and Assumptions.**

(a)  From time to time following the Closing, Seller and Purchaser shall, and shall cause (to the extent empowered to do so) their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser, and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(b)  To the extent not obtained at or prior to the Closing, Seller shall use its best efforts to obtain termination statements, lien releases, discharges or other documents, notices or other instruments as Purchaser may reasonably deem necessary to release Interests on the Purchased Assets, each in form and substance reasonably satisfactory to Purchaser.

## ARTICLE II– PURCHASER CONSIDERATION

**Section 2.1 Purchase Price**. The purchase price for the Purchased Assets (the "Purchase Price"") shall be $1.25 million, minus the portion of the OCS Expense to be allocated to the Seller as set

3

forth below. For the avoidance of doubt, the aggregate consideration under this Agreement and the
Israel APA is $2.5 million.

**Section 2.2 OCS Expense**. The Parties and the Israel Subsidiary will work in good faith to obtain
consent from Israel's Office of the Chief Scientist for a release of claims and approval to export
know-how in the Purchased Assets. Up to $100,000.00 of the aggregate of the Purchase Price
hereunder and the total consideration under Israel APA will be allocated to obtaining such release
(the "OCS Expense"), with such OCS Expense shared equally between Seller and the Israel
Subsidiary; any OCS Expense thereafter will be borne by Purchaser.

## ARTICLE III – CLOSING AND TERMINATION

**Section 3.1 Closing Date**. The closing of the purchase and sale of the Purchased Assets and the
assumption of the Assumed Liabilities (the "Closing") shall be within a reasonable period of time
following the entry of the Bankruptcy Sale Order, but in any event no later than 10 business days
following the date of entry of the Bankruptcy Sale Order, unless otherwise agreed to in writing by
the Parties, and subject to the satisfaction or waiver of the conditions set forth in Article VIII (other
than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction
or waiver of such conditions). The date on which the Closing shall be held is referred to in this
Agreement as the "Closing Date."

**Section 3.2    Deliveries by Seller**. At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed bill of sale in the form attached as Exhibit B (Form of Bill of Sale)
hereto (the "Bill of Sale") which will state that the Purchased Assets were sold by the Seller "as is
– where is," without representation or warranty, express or implied, including without
representation of marketability and/or fitness for any particular purpose, other than as expressly
set forth otherwise in this Agreement.

(b)    a duly executed assignment and assumption agreement in the form attached as
Exhibit C (Form of Assignment Agreement) hereto (the "Assignment Agreement") and duly
executed assignments transferring all of Seller's rights, titles and interests in and to the Intellectual
Property included in the Purchased Intellectual Property, in a form suitable for recording in the
U.S. Patent and Trademark Office, the U.S. Copyright Office and other similar offices and agencies
in other countries;

(c)    a duly executed license agreement in the form attached as Exhibit D (Form of
Telecom IP License Agreement) hereto;

(d)    a certified copy of the Bankruptcy Sale Order; and

(e)    an instrument signed by the Trustee (in form and substance reasonably satisfactory
to Purchaser) certifying the satisfaction of the conditions set forth in Sections 8.1(a) and (b) hereof;

**Section 3.3 Deliveries by Purchaser**. At the Closing, Purchaser shall deliver to Seller duly
executed copies of the Bill of Sale and Assignment Agreement and Purchaser shall provide to the
Seller the aggregate amount of the Purchase Price in accordance with Section 2.1 above.

**Section 3.4 Termination of Agreement**. This Agreement may be terminated prior to the Closing
Date only as follows:

4

(a)      By the joint written consent of Seller and Purchaser;

(b)      By either Purchaser or Seller if the Closing has not occurred on or before March 31, 2014, only if so confirmed in a written instrument executed by Purchaser;

(c)      By Purchaser if the Bankruptcy Court or any other governmental authority enters an order or makes a ruling or takes any other action that otherwise precludes the consummation of the transactions contemplated herein on the terms and conditions set forth in this Agreement or precludes the parties to the Israel APA from consummating the transactions therein;

(d)      By Purchaser, upon a material breach of any covenant or agreement of Seller set forth in this Agreement, or if any material representation of Seller shall have been or becomes untrue or upon any termination of the Israel APA prior to the closing thereof;

(e)      By Purchaser, if the Bankruptcy Sale Order entered by the Bankruptcy Court with Purchaser's consent is modified in any manner materially adverse to Purchaser without the prior written consent of Purchaser.

**Section 3.5 Effect of Termination.**  No termination of this Agreement pursuant to Section 3.4 shall be effective until notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made.

### ARTICLE IV – REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows:

**Section 4.1 Organization and Good Standing.**  The Debtor is duly organized, validly existing, and in good standing under the laws of the State of Delaware, and, subject to the limitations imposed on Seller as a result of the Bankruptcy Case, or pursuant to any order entered by the Bankruptcy Court, the Debtor had the requisite power and authority to own, lease and operate its properties and to carry on its HSI Business as conducted prior to the commencement of the Bankruptcy Case.

**Section 4.2 Authorization of Agreement.**  The Trustee is the duly qualified and acting Chapter 7 trustee of the Debtor in the Bankruptcy Case, and in conjunction with the trustee of the Israeli Subsidiary has authority to convey title to the Purchased Assets, the foregoing of which as set forth in the Bankruptcy Sale Order. Subject to the entry of the Bankruptcy Sale Order, the Trustee has all requisite power, authority and legal capacity to execute and deliver this Agreement and each other document, agreement, instrument or certificate contemplated by this Agreement or to be executed by Seller or the Trustee in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform its respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by the Trustee and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Bankruptcy Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms.

**Section 4.3 Title to and Sufficiency of Purchased Assets.**  The Debtor owns the Purchased Assets and at the Closing Purchaser will be vested with good and valid title to such Purchased Assets, free

5

and clear of all Interests, to the fullest extent permissible under applicable laws. To the best knowledge of the Seller, other than the Purchased Assets and the assets purchased by the Purchaser under the Israel APA, neither the Seller nor the Debtor (or any of its Affiliates) have any assets necessary for Purchaser to conduct the HSI Business as it has been conducted by the Debtor prior to the commencement of the Bankruptcy Case.

**Section 4.4 Litigation**. To the best knowledge of the Trustee, (a) except for matters before the Bankruptcy Court involving the Debtor or any of its Affiliates, and any matters that will otherwise be resolved by the Bankruptcy Sale Order without any Liability or restriction applicable to Purchaser or the Purchased Assets or matters disclosed on the Debtor's bankruptcy schedules, and (b) the Israel Proceeding related to the Israel Subsidiary, the Debtor is not involved in and the Trustee has not been notified of any legal proceedings pending or threatened against the Debtor or any of its Affiliates, or relating to the HSI Business or any of the Purchased Assets or Assumed Liabilities, before any governmental authority.

**Section 4.5 No Other Representations or Warranties; Schedules**.     Except for the representations and warranties contained in this Article IV, the Seller makes no express or implied representation or warranty with respect to the Debtor, the HSI Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement. The Purchased Assets are being sold "as is – where is" condition as of the Closing Date, without any representations or warranties whatsoever, except for the representations and warranties contained in this Article IV.

The Purchaser is not relying on any statement or representation by the Seller, or any officer, person, firm, agent or representative acting on behalf of the Seller, unless such statement, representation, covenant or warranty is specifically embodied in this Agreement and/or the other Seller Documents.

## ARTICLE V – REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

**Section 5.1 Organization and Good Standing**. Purchaser is an entity registered under the laws of Delaware, validly existing, in good standing and duly qualified to transact business under the laws of Delaware and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

**Section 5.2 Authorization of Agreement**. Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement, and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial

6

reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

## ARTICLE VI – COVENANTS

**Section 6.1 Access to Information**.  Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives, to (a) make such investigation of the properties, businesses and operations of the HSI Business and (b) make such examination of the books and records of the HSI Business, the Purchased Assets and the Assumed Liabilities as Purchaser reasonably requests and to make extracts and copies of such books and records as they relate solely to the Purchased Assets. The Trustee shall use commercially reasonable efforts to cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller to cooperate fully with such representatives in connection with such review and examination.

**Section 6.2 Conduct of the HSI Business Pending the Closing.**  Prior to the Closing, (a) Seller shall: maintain the Purchased Assets in their current condition, ordinary wear and tear excepted; and comply with applicable laws, and (b) Seller shall not take any action that would have an adverse effect on the ability of Seller to consummate the transactions contemplated herein or otherwise affect the HSI Business or the value, utility or transferability of the Purchased Assets.

**Section 6.3 Appropriate Action; Filings.**  Through the Closing Date, Seller and Purchaser shall cooperate with each other and use (and shall cause their respective Affiliates to use) commercially reasonable efforts: (i) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under this Agreement, applicable law or otherwise to consummate and make effective the Transactions, including obtaining all consents and approvals required to consummate the transactions contemplated herein, (ii) to obtain promptly from any governmental authority any orders or permits required to be obtained by Seller or Purchaser or any of their respective Affiliates in connection with the authorization, execution, delivery and performance of this Agreement and the consummation of the Transactions, (iii) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the Transactions required under any applicable law, and (iv) to provide prompt notification to the other Party of any actions pursuant to clauses (i) – (iii) of this Section 6.3.

**Section 6.4 Confidentiality**.  Seller acknowledges that from and after the Closing, all nonpublic information relating to the HSI Business, including, but not limited to the Purchased Assets and the Assumed Liabilities, will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not disclose to any Person any non-public information relating to Purchaser and its Affiliates, or the HSI Business, including but not limited to the Purchased Assets and the Assumed Liabilities, except as required by applicable law or as otherwise becomes available in the public domain other than through any action by Seller in violation of its obligations under this Section 6.4. In addition, Seller shall not issue any press release or public announcement concerning this Agreement or the Transactions, or otherwise disclose same, without obtaining the prior written approval of Purchaser, unless and only to the extent disclosure is otherwise required by applicable law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement. The provisions of this Section 6.4 shall survive the Closing. For purposes herein, "Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust

7

companies, land trusts, business trusts or other organizations, whether or not legal entities, and all governmental authorities.

## ARTICLE VII – TAX MATTERS

**Section 7.1 Transfer Taxes; Withholding.** Except as specifically provided herein, all sales, use, transfer, filing, recordation, registration, documentary, stamp, value-added, goods and services and similar taxes and fees arising from or associated with the purchase and sale of the Purchased Assets and the other transactions contemplated herein (collectively, "Transfer Taxes"), whether levied on Purchaser or Seller, shall be paid by Seller by their respective due dates out of the Purchase Price proceeds.

## ARTICLE VIII – CONDITIONS TO CLOSING

**Section 8.1 Conditions Precedent to Obligations of Purchaser.** The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser, in its sole discretion, in whole or in part to the extent permitted by applicable law): (a) the representations and warranties of Trustee and Seller, as applicable, set forth herein shall be true and correct at and as of the Closing; (b) Trustee and Seller, as applicable, shall have delivered all closing deliverables and shall have performed all of their respective obligations hereunder; and (c) the Israel APA shall remain effective and the TelAviv – Jaffa District Court of Israel shall have approved the same in connection with the Israel Proceeding.

**Section 8.2 Conditions Precedent to Obligations of Purchaser and Seller.** The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable law): (a) there shall not be in effect any law or order by a governmental authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated herein; and (b) the Bankruptcy Court shall have entered the Bankruptcy Sale Order, in form and substance acceptable to the Purchaser, and such order shall be in full force and effect and shall have become a final order without amendment or modification.

**Section 8.3 Frustration of Closing Conditions.** Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 8.1 or Section 8.2, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE IX – MISCELLANEOUS

**Section 9.1 Survival of Representations, Warranties, Covenants and Agreements.** Except with respect to covenants or agreements which are to be performed on or prior to the Closing, all covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms.

**Section 9.2 Injunctive Relief; Specific Performance.** The Parties hereto agree that irreparable harm would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms on a timely basis or were otherwise breached. It is accordingly agreed that the Parties hereto shall be entitled to injunctive or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court

8

of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.3 Expenses**. Except as otherwise set forth in this Agreement, each Party shall bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated hereby and the consummation of the transactions contemplated hereby and thereby.

**Section 9.4 Submission to Jurisdiction.** The resolution of any and all disputes between the Parties herein concerning the Purchased Assets or this Agreement, including any indemnification claims, shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

**Section 9.5 Time of Essence**. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**Section 9.6 Entire Agreement; Amendments and Waivers**. This Agreement (including the Schedules and Exhibits hereto) and the other documents entered into among the Parties in connection with the transactions contemplated herein represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof, including that certain letter of intent, dated December 19, 2013. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

**Section 9.7 Governing Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Connecticut, without reference to conflict of law principles to the contrary.

**Section 9.8 Notices**. All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (i) when delivered personally or by prepaid overnight courier, with a record of receipt, (ii) the fourth day after mailing if mailed by certified mail, return receipt requested, or (iii) the day of transmission, if sent by facsimile or telecopy during regular business hours or the business day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the Parties at the following addresses or facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Parties pursuant to this Section 9.8):

If to Seller:

[TO BE INSERTED]

With a copy to:

[TO BE INSERTED]

If to Purchaser:

Cadence Design Systems, Inc.
2655 Seely Avenue, Building 5

9

San Jose, CA 95134
Fax: (408) 428-5455
Attention: Office of the General Counsel With

a copy to:

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, NY 10166-0193
> Tel: 212.351.2615
> Fax: 212.351.6351
> Attention: Matthew Kelsey

**Section 9.9 Severability**. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by applicable law or public policy, all other terms and provisions hereof shall nevertheless remain in full force and effect so long as the legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party. Upon such determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

**Section 9.10 Binding Effect; Assignment**. This Agreement shall be binding solely upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a Party to this Agreement. Purchaser may assign this Agreement and any or all rights or obligations hereunder to one or more other Persons. Seller shall have no right to assign this Agreement or the rights hereunder without the express written consent of Purchaser, and any attempted assignment in violation of this clause will be null and void.

**Section 9.11 Counterparts**. This Agreement may be executed and delivered (including by electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be
executed by its respective officers thereunto duly authorized, as applicable, all as of the date first
above written.

**TRUSTEE OF TRANSWITCH CORPORATION**

By: _____

   Name:

Title:

**CADENCE DESIGN SYSTEMS, INC.**

By: _____

   Name:

Title:

*[Signature Page to U.S. Asset Purchase Agreement]*

## EXHIBIT A

### Purchased Assets

1.      Intellectual Property necessary to conduct the HSI Business, including agreements under which Seller licenses Intellectual Property from its Affiliates, but excluding the Excluded Assets (the "Purchased Intellectual Property");

2.      All other tangible personal property owned by Seller related to, useful in or held for use in the conduct of the HSI Business, including equipment, computers (including data contained thereon), software disks and documentation, computer storage (including hard drives), machines, hardware, electronics, file servers relating to or available for sale or use in connection with the HSI Business;

3.      The Purchased Intellectual Property, together with any claims or causes of action with respect to infringement, misappropriation or dilution of any of the Purchased Intellectual Property;

4.      All documents and records relating to the HSI Business and that are used in, held for use in or intended to be used in, or that arise primarily out of, the Purchased Intellectual Property or otherwise out of the HSI Business;

5.      All rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the HSI Business or the Purchased Assets (or any portion thereof); and

6.      All other assets, properties, rights and claims of Seller of any kind or nature which relate to the HSI Business, which are used or useful in or held for use in the HSI Business, or which relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described herein.

For the avoidance, the Purchased Assets set forth in paragraphs 1-6 above exclude the Excluded Assets.

For purposes of this Agreement, "Intellectual Property" means all worldwide intellectual property and rights arising from or in respect of the following: all (i) HSI Business patents, patent applications (including provisional and Patent Cooperation Treaty applications), patent disclosures and all related continuations, divisionals, continuations-in-part, reexaminations and reissues, extensions, renewals, and counterparts thereof, all industrial designs, industrial models and utility models, certificates of invention, as well as rights to file for, and to claim priority to, any such patent rights (collectively, "Patents"); (ii) HSI Business trademarks, service marks, certification marks, collective marks, trade names, business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols, Internet domain names and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising by law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing (collectively, "Marks"); (iii) HSI Business published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information, computer software, source code, object code, algorithms, and other similar materials and Internet website content), copyrights, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"); (iv) HSI Business

inventions, developments, discoveries and concepts (whether or no patentable and whether or not reduced to practice), systems, confidential and proprietary information, technical information, data, technical plans, compilations, technical plans, production and manufacturing processes and techniques, trade secrets, and know-how, including methods and/or materials, processes, procedures, business plans, schematics, specifications, software and databases (including source code, object code and algorithms), formulae, drawings, illustrations, prototypes, models, designs, devices, technology, research and development and customer information and lists (collectively, "Trade Secrets"); (v) all other HSI Business proprietary rights relating to any of the foregoing; (vi) HSI Business copies and tangible embodiments thereof (in whatever form or medium); and (vii) rights to sue or recover for past, present or future infringements, misappropriations, dilution, unauthorized use or disclosure, or other conflict with any of the foregoing HSI Business intellectual property.

## EXHIBIT B

### Form of Bill of Sale

This Bill of Sale (this "Bill of Sale") is made as of January ___, 2014, by Ronald I. Chorches, in his capacity as Chapter 7 Bankruptcy Trustee of, and on behalf of, TranSwitch Corporation, a Delaware corporation (the "Seller") for the benefit of Cadence Design Systems, Inc., a Delaware corporation (the "Purchaser").

### RECITALS

A. The Seller and the Purchaser have entered into that certain Asset Purchase Agreement dated as of the date hereof (the "Agreement"), pursuant to which the Seller has agreed to sell, transfer and deliver, and the Purchaser has agreed to purchase and acquire, the Purchased Assets. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement; and

B. Pursuant to the Agreement, the Seller has agreed to execute and deliver this Bill of Sale to the Purchaser for the purpose of transferring to and vesting in the Purchaser title to the Purchased Assets as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises, the covenants and agreements contained in the Agreement and in this Bill of Sale, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. The terms and provisions of the Agreement shall apply to this Bill of Sale, and the terms and conditions of this Bill of Sale shall be construed consistently therewith.

2. The Seller does hereby sell, transfer, convey, assign, deliver and vest in the Purchaser, its successors and assigns forever, all of its right, title and interest in and to the Purchased Assets, certain of which are listed in Schedule 1 hereto.

3.      The Seller hereby constitutes and appoints the Purchaser, its successors and assigns, as the Seller's true and lawful attorney, with full power of substitution, in the Seller's name and stead, on behalf of and for the benefit of the Purchaser, its successors and assigns, to demand and receive any and all of the Purchased Assets and to give receipts and releases for and in respect of the Purchased Assets, or any part thereof, and from time to time to institute and prosecute in the Seller's name, at the sole expense and for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser, its successors and assigns, reasonably may require for the collection or reduction to possession of any of the Purchased Assets. The Seller hereby declares that the foregoing powers are coupled with an interest and are and shall be irrevocable and, accordingly, may not be revoked by Seller in any manner or for any reason whatsoever.

4.      The Seller hereby covenants that, from time to time after the delivery of this Bill of Sale, at the Purchaser's request, the Seller will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered such further acts, conveyances, transfers, assignments, powers of attorney and assurances as the Purchaser may reasonably require to convey, transfer to and vest in the Purchaser, and to put the Purchaser in possession of, any of the Purchased Assets.

5.      Nothing in this Bill of Sale shall alter any liability or obligation of the Seller or the Purchaser arising under the Agreement.

6.      This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, this Bill of Sale has been executed as of the date first written above.

**TRUSTEE OF TRANSWITCH CORPORATION**

By: _____

Name:

Title:

**AGREED AND ACCEPTED:**

**CADENCE DESIGN SYSTEMS, INC.**

By: _____

Name:

Title:

*[Signature Page to U.S. Bill of Sale]*

**SCHEDULE 1**

## Certain Purchased Assets

[*To be attached*]

## EXHIBIT C

### Form of Assignment Agreement

This Assignment Agreement (this "Assignment") is made as of January __, 2014, by Ronald I. Chorches, in his capacity as Chapter 7 Bankruptcy Trustee of, and on behalf of, TranSwitch Corporation, a Delaware corporation ("Assignor"), in favor of Cadence Design Systems, Inc., a Delaware corporation ("Assignee").

### RECITALS

WHEREAS, Assignor and Assignee have entered into that certain Asset Purchase Agreement dated as of the date hereof (the "Agreement"), pursuant to which Assignor has agreed to sell, transfer and deliver to the Assignee the Purchased Assets of Assignor. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement; and

WHEREAS, pursuant to the Agreement, Assignor has agreed to transfer and assign to Assignee, and Assignee has agreed to acquire all of Assignor's right, title, and interest in and to all of the Purchased Intellectual Property listed on Schedule 1 hereto, together with the goodwill pertaining thereto (collectively, the "Assigned Intellectual Property").

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises, the covenants and agreements contained in the Agreement and in this Assignment, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to implement the assignments of Intellectual Property required by the Agreement, Assignor hereby agrees as follows:

1. The terms and provisions of the Agreement shall apply to this Assignment, and the terms and conditions of this Assignment shall be construed consistently therewith.

2. Assignor does hereby sell, transfer, convey, assign, grant, set over and deliver to Assignee, and Assignee hereby accepts, all of Assignor's right, title, and interest in and to the Assigned Intellectual Property, free and clear of all liens, mortgages, options, charges, title defects, security interests and similar encumbrances, the same to be held by Assignee for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns, designees, nominees and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment and sale had not been made, together with all causes of action (in law or equity), claims, demands and any other rights for, or arising from any past, present or future infringement, of the Assigned Intellectual Property, along with the right to sue for and collect any damages for the use and benefit of Assignee and Assignee's successors, assigns, designees, nominees and other legal representatives.

3. Assignor hereby authorizes and requests the Commissioner of Patents and Trademarks of the United States, the Register of Copyrights of the United States, and any officer of any country or countries foreign to the United States, whose duty it is to issue, certify, or assign registrations or applications for service marks, trademarks, patents, copyrights, Internet domain names or other evidence or forms of intellectual property protection, to issue, certify or assign as

appropriate, the same to Assignee and Assignee's successors, assigns, designees, nominees and other legal representatives in accordance with the terms of this Assignment.

**IN WITNESS WHEREOF**, this Assignment has been executed as of the day and year first written above.

> **TRUSTEE OF TRANSWITCH**
> **CORPORATION:**
>
>
> By: _____
> Name:
> Title:

**ACKNOWLEDGED AND ACCEPTED:**

**CADENCE DESIGN SYSTEMS, INC.**

By: _____
   Name:
   Title:

*[Signature Page to Assignment Agreement]*

**Acknowledgement by Notary Public**

State of _____

County of _____

    On this _____ day of _____, _____, before me, the undersigned Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

Seal:                        Signature: _____ ____ ____ _____ ____ _____

                        Name:                    ,   Notary   Public

**SCHEDULE 1**

**Assigned Intellectual Property**

[*To be attached*]

Final Form

## EXHIBIT D

### Form of Telecom IP License Agreement

### PATENT LICENSE AGREEMENT

This **PATENT LICENSE AGREEMENT** (this "*Agreement*") is entered into as of January __, 2014 (the "*Effective Date*") between Ronald I. Chorches, in his capacity as Chapter 7 Bankruptcy Trustee of, and on behalf of, TranSwitch Corporation, a Delaware corporation ("*Licensor*"), and Cadence Design Systems, Inc., a Delaware corporation ("*Licensee*").

#### RECITALS

**WHEREAS**, pursuant to that certain Asset Transfer Agreement dated as of January __, 2014 (the "*APA*"), by and between the Licensor and Licensee, Licensor is transferring to Licensee certain Purchased Assets (as defined in the APA) relating to high speed interface technology and Licensor is retaining certain assets relating to its telecommunications equipment business; and

**WHEREAS**, in connection with entering into the APA, Licensor and Licensee desire to enter into an agreement providing for the Licensor to license certain patents to Licensee, pursuant to the terms and conditions set forth below.

**NOW THEREFORE**, in consideration of the foregoing premises and the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

#### AGREEMENT

1. **DEFINITIONS.** As used in this Agreement:

    **1.1** "*Affiliate*" of a party means any person or entity that directly or indirectly controls, is controlled by, or is under common control with such party, where "control" means ownership of fifty percent (50%) or more of the outstanding voting securities but only as long as such person or entity meets these requirements.

    **1.2** "*Aggregate Product*" means any product that incorporates a Licensed Product in conjunction with any other product or technology different from Licensed Products, including telecommunication apparatus and systems.

    **1.3** "*Improvement*" means any improvement conceived, invented, developed, or obtained, by or for Licensor, to the inventions, methods, apparatuses, or technologies claimed in any and all patents and patent applications owned by Licensor or any of its Affiliates that relate to Licensor's telecommunications equipment business.

    **1.4** "*License*" means the license granted to Licensee in Section 2.

**1.5** *"Licensed Patents"* means (i) any and all patents and patent applications owned or controlled by Licensor or any of its Affiliates, on or following the Effective Date, that relate to Licensor's telecommunications equipment business, including those listed on Exhibit A attached hereto, (ii) any patents or patent applications claiming any Improvements, and (iii) any and all patents issuing or claiming priority from any of the patents and patent applications referenced in clauses (i) and (ii) anywhere in the world including provisional applications, non-provisional applications, utility patents, design patents, continuations, continuations-in-part, divisionals, post-grant review, supplemental examinations, certificates, reexaminations, reissues, and extensions thereof, and foreign counterparts, and substitutions of the patents and patent applications referenced in clauses (i) and (ii) whether or not such patent applications or patents exist as of the Effective Date.

**1.6** *"Licensed Products"* means (i) all of the Purchased Assets as defined and set forth in the APA, and the Bill of Sale and Assignment Agreement each referenced therein, and (ii) any high speed interface or component thereof, in each case, including high speed interface circuits, the design, development, marketing, manufacture, sale, distribution, research and other exploitation of intellectual property designs, including IP cores, firmware, design tools, and other software, and services that relate thereto, in each case in connection with the high speed interface technology business, including but not limited to HDMI, DisplayPort, MHL and Gigabit and other Ethernet IP technology.

**1.7** *"Licensed Process"* means any process that is used as part of a Licensed Product or that is used to manufacture a Licensed Product.

## 2. LICENSE

Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee and its Affiliates a worldwide, perpetual, irrevocable, fully paid up, royalty-free nonexclusive, assignable, sublicensable license, under the Licensed Patents, to: (i) use, develop, make, have made, sell, offer to sell, have sold import, export or otherwise dispose of any Licensed Products, and (ii) to use and perform, have used or have performed any Licensed Process. For the avoidance of doubt, this License extends to any Licensed Product or Licensed Process that is part of an Aggregate Product if and to the extent that the Licensed Product or Licensed Process infringes one or more claims of the Licensed Patents, whether directly, indirectly, contributorily or by inducement (in each case, *"Licensed Product Infringement"*); provided, however, that this License does not extend beyond the Licensed Product or Licensed Process to the Aggregate Product if and to the extent that the Aggregate Product infringes one or more claims of the Licensed Patents (whether directly, indirectly, contributorily or by inducement) and the Aggregate Product infringement does not constitute Licensed Product Infringement.

## 3. TERM

This Agreement will take effect on the Effective Date and will remain in effect until the expiration of the last to expire Licensed Patents.

## 4. GENERAL

2

**4.1  Notice.** Any notice, approval, authorization, consent, or other communication required or permitted to be delivered to either party under this Agreement must be in writing and will be deemed properly delivered, given, and received (a) when delivered by hand, or (b) two (2) business days after delivered by courier or express delivery service or by facsimile to the address or facsimile number set forth beneath the name of such party below (or to such other address or facsimile number as such party may have specified in a written notice to the other party):

If to Licensor, to:                                    If to Licensee, to:

                                                       Cadence Design Systems, Inc.
                                                       2655 Seely Avenue Bldg 5
                                                       San Jose, CA 95134, United States
                                                       Facsimile: (408) 428-5455
                                                       Attention: Office of the General Counsel

**4.2  Governing Law.** This Agreement will be construed, interpreted and enforced in accordance with the laws of, and disputes hereunder will be subject to jurisdiction in the state and federal courts of the State of Delaware, without regard to any principles of conflict of laws to the contrary.

**4.3  Bankruptcy.** The parties acknowledge and agree that this Agreement is a contract under which Licensor is a licensor of intellectual property as provided in Section 365(n) of title 11, United States Code (the "Bankruptcy Code"). In the event that Licensor, as a debtor in possession or a trustee in bankruptcy in a case under the Bankruptcy Code sells or assigns any of the Licensed Patents to a third party purchaser or assignee, Licensor covenants and agrees to assume and assign to such purchaser or assignee this Agreement pursuant to Section 365 of the Bankruptcy Code.

**4.4  Waiver.** All waivers must be in writing and signed by an authorized representative of the party to be charged. Any waiver or failure to enforce any provision of this Agreement on one occasion will not be deemed a waiver of any other provision or of such provision on any other occasion.

**4.5  Severability.** If any provision of this Agreement is unenforceable, such provision will be changed and interpreted to accomplish the objectives of such provision to the greatest extent possible under applicable law and the remaining provisions will continue in full force and effect.

**4.6  Independent Contractors.** This Agreement is not intended to establish any partnership, joint venture, employment, or other relationship between the parties except that of independent contractors.

3

**4.7      Construction.** The section headings in this Agreement are for convenience of reference only, will not be deemed to be a part of this Agreement, and will not be referred to in connection with the construction or interpretation of this Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be applied in the construction or interpretation of this Agreement. As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation." All references in this Agreement to "Sections" are intended to refer to Sections of this Agreement.

**4.8      Counterparts.** This Agreement may be executed in several counterparts, each of which will constitute an original and all of which, when taken together, will constitute one agreement.

**4.9      Entire Agreement.** This Agreement, together with the APA and the schedules and exhibits set forth herein and therein, sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes all prior agreements and understandings between the parties relating to the subject matter hereof. This Agreement may not be amended, modified, altered, or supplemented other than by means of a written instrument duly executed and delivered on behalf of both parties.

**4.10      Successors-in-Interest.** This Agreement will be binding upon any acquirers, successors-in-interest, and affiliates of the Parties hereto.

[Signature Page Follows]

4

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

LICENSOR:                          LICENSEE:

                                   **CADENCE   DESIGN   SYSTEMS,   INC.,**
                                   on behalf of itself and its Affiliates

By:                                By:

Name:                              Name:

Title:                             Title:

*[Signature Page to Patent License]*

**Exhibit A**

<u>Certain Licensed Patents</u>

*[To be attached]*

## Exhibit 2

### License Agreement

Final Form

## PATENT LICENSE AGREEMENT

This **PATENT LICENSE AGREEMENT** (this "*Agreement*") is entered into as of January __, 2014 (the "*Effective Date*") between Ronald I. Chorches, in his capacity as Chapter 7 Bankruptcy Trustee of, and on behalf of, TranSwitch Corporation, a Delaware corporation ("*Licensor*"), and Cadence Design Systems, Inc., a Delaware corporation ("*Licensee*").

### RECITALS

**WHEREAS**, pursuant to that certain Asset Transfer Agreement dated as of January __, 2014 (the "*APA*"), by and between the Licensor and Licensee, Licensor is transferring to Licensee certain Purchased Assets (as defined in the APA) relating to high speed interface technology and Licensor is retaining certain assets relating to its telecommunications equipment business; and

**WHEREAS**, in connection with entering into the APA, Licensor and Licensee desire to enter into an agreement providing for the Licensor to license certain patents to Licensee, pursuant to the terms and conditions set forth below.

**NOW THEREFORE**, in consideration of the foregoing premises and the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### AGREEMENT

1.  **DEFINITIONS.** As used in this Agreement:

    **1.1**  "*Affiliate*" of a party means any person or entity that directly or indirectly controls, is controlled by, or is under common control with such party, where "control" means ownership of fifty percent (50%) or more of the outstanding voting securities but only as long as such person or entity meets these requirements.

    **1.2**  "*Aggregate Product*" means any product that incorporates a Licensed Product in conjunction with any other product or technology different from Licensed Products, including telecommunication apparatus and systems.

    **1.3**  "*Improvement*" means any improvement conceived, invented, developed, or obtained, by or for Licensor, to the inventions, methods, apparatuses, or technologies claimed in any and all patents and patent applications owned by Licensor or any of its Affiliates that relate to Licensor's telecommunications equipment business.

    **1.4**  "*License*" means the license granted to Licensee in Section 2.

    **1.5**  "*Licensed Patents*" means (i) any and all patents and patent applications owned or controlled by Licensor or any of its Affiliates, on or following the Effective Date, that relate to Licensor's telecommunications equipment business, including those listed on Exhibit A attached hereto, (ii) any patents or patent applications claiming any Improvements, and (iii) any and all

patents issuing or claiming priority from any of the patents and patent applications referenced in clauses (i) and (ii) anywhere in the world including provisional applications, non-provisional applications, utility patents, design patents, continuations, continuations-in-part, divisionals, post-grant review, supplemental examinations, certificates, reexaminations, reissues, and extensions thereof, and foreign counterparts, and substitutions of the patents and patent applications referenced in clauses (i) and (ii) whether or not such patent applications or patents exist as of the Effective Date.

    **1.6** *"Licensed Products"* means (i) all of the Purchased Assets as defined and set forth in the APA, and the Bill of Sale and Assignment Agreement each referenced therein, and (ii) any high speed interface or component thereof, in each case, including high speed interface circuits, the design, development, marketing, manufacture, sale, distribution, research and other exploitation of intellectual property designs, including IP cores, firmware, design tools, and other software, and services that relate thereto, in each case in connection with the high speed interface technology business, including but not limited to HDMI, DisplayPort, MHL and Gigabit and other Ethernet IP technology.

    **1.7** *"Licensed Process"* means any process that is used as part of a Licensed Product or that is used to manufacture a Licensed Product.

**2.**     LICENSE

    Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee and its Affiliates a worldwide, perpetual, irrevocable, fully paid up, royalty-free non-exclusive, assignable, sublicensable license, under the Licensed Patents, to: (i) use, develop, make, have made, sell, offer to sell, have sold import, export or otherwise dispose of any Licensed Products, and (ii) to use and perform, have used or have performed any Licensed Process. For the avoidance of doubt, this License extends to any Licensed Product or Licensed Process that is part of an Aggregate Product if and to the extent that the Licensed Product or Licensed Process infringes one or more claims of the Licensed Patents, whether directly, indirectly, contributorily or by inducement (in each case, *"Licensed Product Infringement"*); provided, however, that this License does not extend beyond the Licensed Product or Licensed Process to the Aggregate Product if and to the extent that the Aggregate Product infringes one or more claims of the Licensed Patents (whether directly, indirectly, contributorily or by inducement) and the Aggregate Product infringement does not constitute Licensed Product Infringement.

**3.**     TERM

    This Agreement will take effect on the Effective Date and will remain in effect until the expiration of the last to expire Licensed Patents.

**4.**     GENERAL

    **4.1**     Notice. Any notice, approval, authorization, consent, or other communication required or permitted to be delivered to either party under this Agreement must be in writing and will be deemed properly delivered, given, and received (a) when delivered by hand, or (b) two (2) business days after delivered by courier or express delivery service or by facsimile to the

address or facsimile number set forth beneath the name of such party below (or to such other address or facsimile number as such party may have specified in a written notice to the other party):

If to Licensor, to:                          If to Licensee, to:

                                             Cadence Design Systems, Inc.
                                             2655 Seely Avenue Bldg 5
                                             San Jose, CA 95134, United States
                                             Facsimile: (408) 428-5455
                                             Attention: Office of the General Counsel

**4.2    Governing Law.** This Agreement will be construed, interpreted and enforced in accordance with the laws of, and disputes hereunder will be subject to jurisdiction in the state and federal courts of the State of Delaware, without regard to any principles of conflict of laws to the contrary.

**4.3    Bankruptcy.** The parties acknowledge and agree that this Agreement is a contract under which Licensor is a licensor of intellectual property as provided in Section 365(n) of title 11, United States Code (the "Bankruptcy Code"). In the event that Licensor, as a debtor in possession or a trustee in bankruptcy in a case under the Bankruptcy Code sells or assigns any of the Licensed Patents to a third party purchaser or assignee, Licensor covenants and agrees to assume and assign to such purchaser or assignee this Agreement pursuant to Section 365 of the Bankruptcy Code.

**4.4    Waiver.** All waivers must be in writing and signed by an authorized representative of the party to be charged. Any waiver or failure to enforce any provision of this Agreement on one occasion will not be deemed a waiver of any other provision or of such provision on any other occasion.

**4.5    Severability.** If any provision of this Agreement is unenforceable, such provision will be changed and interpreted to accomplish the objectives of such provision to the greatest extent possible under applicable law and the remaining provisions will continue in full force and effect.

**4.6    Independent Contractors.** This Agreement is not intended to establish any partnership, joint venture, employment, or other relationship between the parties except that of independent contractors.

**4.7    Construction.** The section headings in this Agreement are for convenience of reference only, will not be deemed to be a part of this Agreement, and will not be referred to in connection with the construction or interpretation of this Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be applied in the construction or interpretation of this Agreement. As used in this Agreement, the words "include"

3

and "including," and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation." All references in this Agreement to "Sections" are intended to refer to Sections of this Agreement.

**4.8** **Counterparts.** This Agreement may be executed in several counterparts, each of which will constitute an original and all of which, when taken together, will constitute one agreement.

**4.9** **Entire Agreement.** This Agreement, together with the APA and the schedules and exhibits set forth herein and therein, sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes all prior agreements and understandings between the parties relating to the subject matter hereof. This Agreement may not be amended, modified, altered, or supplemented other than by means of a written instrument duly executed and delivered on behalf of both parties.

**4.10** **Successors-in-Interest.** This Agreement will be binding upon any acquirers, successors-in-interest, and affiliates of the Parties hereto.

[Signature Page Follows]

4

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

LICENSOR:

LICENSEE:

**CADENCE DESIGN SYSTEMS, INC.,**
on behalf of itself and its Affiliates

By:_____

By:_____

Name:_____

Name:_____

Title:_____

Title:_____

*[Signature Page to Patent License]*

**Exhibit A**

<u>Certain Licensed Patents</u>

[*To be attached*]

## Exhibit 3

## Subsidiary Purchase Agreement

**EXECUTION COPY**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of January 14, 2014 (this "Agreement"), is made and entered into by and between TranSwitch (Israel) Ltd (in temporary liquidation), an Israeli company ("Seller"), and Cadence Design Systems, Inc., a Delaware corporation, or one or more of its affiliates or designees ("Purchaser"). Seller and Purchaser are sometimes herein referred to collectively as the "Parties" and individually as a "Party". All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

## W I T N E S S E T H:

WHEREAS, Seller is a subsidiary of TranSwitch Corporation, a Delaware corporation and a global provider of high-speed interface technology (the "Parent"); and

WHEREAS, in connection therewith, Seller engaged in the business of high-speed interface technology, including the design, development, marketing, sale, distribution, research and other exploitation of intellectual property designs, including IP cores, firmware, design tools, and other software, and services that relate thereto, in each case in connection with the high speed interface technology business, and including but not limited to HDMI, DisplayPort, MHL, and Gigabit and other Ethernet IP technology (the "Business") (as used herein, "includes" and its derivatives means "includes without limitation"); and

WHEREAS, the Parent has commenced a Chapter 7 case in the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division (the "Bankruptcy Court"), and in connection therewith is seeking to sell certain assets owned by the Parent, pursuant to the U.S. APA (as defined below) and in accordance with a requested order of the Bankruptcy Court to approve such sale; and

WHEREAS, Seller is currently subject to temporary liquidation proceedings pursuant to that certain ordinance, dated 11.27.2013, as issued by the Tel-Aviv - Jaffa District Court (the "Israeli Court"); and

WHEREAS, on November 27, 2013, the Israeli Court appointed Mr. Lior Dagan as the temporary liquidator of the Seller (the "Temporary Liquidator"), and the Temporary Liquidator is seeking the approval of the Israeli Court for a sale of the Purchased Assets (as defined below) pursuant to the terms and conditions of this Agreement; and

WHEREAS, the Seller has received that certain funding from the Office of the Chief Scientist in the Israeli Ministry of Economy (the "OCS") for that certain Gigabit PHY project, no. 26204 (the "Gigabit Project"), and in connection therewith the Seller will obtain the OCS Approval (as defined below) as set forth in this Agreement; and

WHEREAS, the Parties as well as the Parent signed a letter agreement dated December 19, 2013 proposing, among other things, that Seller and Purchaser enter into an agreement for the purchase of assets related to the Business, contingent upon approval of the Israeli Court

permitting the sale and purchase of the Purchased Assets pursuant to this Agreement (the "Israeli Court's Order"), and other factors (the "Letter of Intent"); and

WHEREAS, Purchaser and the Parent are, substantially concurrently herewith, entering into an asset purchase agreement for Purchaser to acquire assets of the Parent related to the Business as specified therein (the "U.S. APA"); and

WHEREAS, on the terms and subject to the conditions hereinafter set forth, and subject to the Israeli Court's Order, the Parties desire to enter into this Agreement pursuant to which, among other things, Seller shall sell and transfer to Purchaser, and Purchaser shall purchase and acquire from Seller, all of Seller's right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I – PURCHASE AND SALE

**Section 1.1    Purchase and Sale of Assets**.    Pursuant to applicable provisions of the Companies Ordinance, 1983, the Israeli Court's Order and on the terms and subject to the conditions set forth in this Agreement, at the Closing, other than the Excluded Assets (defined below), Seller shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, free and clear of any and all Interests (other than Interests created by Purchaser) to the maximum extent permitted under applicable laws, all of Seller's right, title and interest in, to and under any and all of the assets, personal properties, rights and claims of any kind or nature, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of Seller, which are used or useful in or held for use in connection with the operation of the Business, and all of the Seller Intellectual Property as defined in Exhibit A, attached hereto; excluding only the Excluded Assets expressly identified in Section 1.2 (such assets, properties, rights and claims to be acquired hereunder collectively referred to herein as the "Purchased Assets"). For purposes herein, "Interest(s)" means any mortgage, deed of trust, interest, pledge, hypothecation, attachment, levy, charge, security interest, conditional sale agreement, title retention contract, right of first refusal, option to purchase, encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and other consensual or non-consensual lien or charge of any kind, whenever granted. As of the Closing Date, the Purchaser shall not assume any agreement of the Seller. The Parties acknowledge that while the Purchaser shall not assume any Liability of the Seller (including but not limited to any Liability of the Seller pursuant to agreements by and between the Seller and its customers), the Seller granted non-exclusive licenses to certain customers which are in full force and effect.

**Section 1.2    Excluded Assets**.    Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. For purposes herein, "Excluded Assets" shall mean only the following assets: (a) the assets under Seller's business relating to the sale, manufacturing, distribution or marketing of integrated circuits or any related services, including, for the avoidance of doubt, any inventory of integrated circuits or any contracts under which

2

Seller sells integrated circuits or related services to third parties, but excluding assets that constitute Intellectual Property necessary to conduct the Business, and (b) the assets under Seller's business relating to the telecommunications business or any related services, including, for the avoidance of doubt, any inventory or contracts related thereto, but excluding assets that constitute Intellectual Property necessary to conduct the Business.

**Section 1.3     Excluded Liabilities.**     Notwithstanding anything to the contrary in this Agreement, the Parties expressly acknowledge and agree that Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of Seller or of any predecessor or Affiliate of Seller, existing on the Closing Date or arising thereafter. For purposes herein, "Liability" or "Liabilities" means any and all past income and other taxes related to the Seller, all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations, of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder). All of the Liabilities of Seller or of any predecessor or Affiliate of Seller shall be referred to herein collectively as the "Excluded Liabilities", which shall include any Liability of the Seller related to the employment or engagement of employees or consultants of the Seller and any Liability to the OCS (other than the Excess Transfer Fee (as defined below)). For purposes herein, "Affiliate" of a party means any person or entity that directly or indirectly controls, is controlled by, or is under common control with such party, where "control" means ownership of fifty percent (50%) or more of the outstanding voting securities but only as long as such person or entity meets these requirements.

**Section 1.4     Further Conveyances and Assumptions.**

(a)     From time to time following the Closing, Seller and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby; provided, that nothing in this Section 1.4 shall require the Purchaser to assume any Liabilities.

(b)     To the extent not obtained at or prior to Closing, Seller shall obtain termination statements, lien releases, discharges or other documents, notices or other instruments as Purchaser may reasonably deem necessary to release Interests on the Purchased Assets, each in form and substance reasonably satisfactory to Purchaser.

3

## ARTICLE II– PURCHASER CONSIDERATION

**Section 2.1    Purchase Price**. The purchase price for the Purchased Assets (the "Purchase Price") shall be US$1.25 million (which includes the portion of the OCS Fee (as defined below) to be allocated to the Seller, which in no event shall exceed US$50,000), plus VAT (if applicable), plus the amount of the Excess Transfer Fee, if any.

### Section 2.2    OCS Approval.

(a)    As set forth in Section 3.2(d) herein, as a condition to the Closing (as defined below), the Seller shall obtain a written binding consent from the OCS for the transfer and/or assignment by the Seller of any Seller Intellectual Property (which was developed by the support of the OCS) included in the Purchased Assets, to the Purchaser, including, without limitation, any and all know-how developed as part of the Gigabit Project, and any rights thereto, outside of Israel at any time elected by the Purchaser as of, or following, the Closing Date, free of any restrictions and conditions, including without limitation, restrictions and conditions relating to the sale, assignment, transfer or any other disposition thereof, and including registration, further development or any usages of such Intellectual Property, and including any other restriction, limitation or obligation imposed by virtue of an instrument of approval of any grant provided to the Seller by the OCS pursuant to, or by virtue of, the Encouragement of Industrial Research and Development Law, 5744-1984 ("R&D Law"), which consent shall include calculation of the transfer fee based on the relief permitted in bankruptcy proceedings under Section 19B(e) of the R&D Law (the "OCS Approval"). The Parties agree that US$400,000 represents the aggregate value of the Gigabit Project, which value is calculated on the aggregate consideration of US$2.5 million payable hereunder and pursuant to the U.S. APA.

(b)    Up to $100,000.00 of the aggregate of the Purchase Price hereunder and the total consideration under U.S. APA will be allocated to obtaining the OCS Approval (the "OCS Fee"), which such OCS Fee shall be shared equally between Seller and the Parent. At the Closing, pursuant to Section 3.3, the Purchaser shall, on behalf of itself and Parent, remit to the Seller the portion of the OCS Fee for which Parent is responsible pursuant to the preceding sentence (the "US Portion of OCS Fee") and the Excess Transfer Fee, if any. Immediately upon receipt thereof, Seller shall (i) notify Purchaser, (ii) pay the OCS Fee (including the US Portion of the OCS Fee) together with the Excess Transfer Fee, if any, to the OCS and (iii) promptly provide Purchaser written evidence of such payment in form and substance acceptable to Purchaser.

(c)    Any transfer fee in connection with the Gigabit Project, which is over and above the OCS Fee and required by the OCS (as set forth in the OCS Approval), shall be borne by Purchaser (the "Excess Transfer Fee") which shall be treated as an adjustment to the Purchase Price as set forth above in Section 2.1. The Seller shall consult with the Purchaser (prior to the Closing) regarding all matters relating to the OCS Approval and will coordinate any discussions with the OCS.

## ARTICLE III – CLOSING AND TERMINATION

**Section 3.1    Closing Date**. The closing of the purchase and sale of the Purchased Assets (the "Closing") shall be on the date that is no later than three (3) Business Days following the

4

satisfaction or waiver of the conditions set forth in this Article VIII (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless otherwise agreed to in writing by the Parties. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." At the Closing, the transactions and documents described in Sections 3.2 and 3.3 herein shall be deemed to take place or delivered simultaneously and no transaction shall be deemed to have been completed or any document delivered until all such transactions have been completed and all required documents delivered.

**Section 3.2    Deliveries by Seller.**    At the Closing, Seller shall deliver to Purchaser the following deliverables:

(a)    a duly executed bill of sale and assignment agreement substantially in the form attached as Exhibit B hereto (the "Bill of Sale and Assignment Agreement") and duly executed assignments transferring all of Seller's rights, titles and interests in and to the Intellectual Property included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office, the U.S. Copyright Office and other similar offices and agencies in Israel and other countries;

(b)    a certified copy of the Israeli Court's Order;

(c)    a certificate signed by an authorized officer of Seller (in form and substance reasonably satisfactory to Purchaser) pursuant to Sections 8.1(a) and (b); and

(d)    the OCS Approval in form and substance reasonably acceptable to Purchaser.

**Section 3.3    Deliveries by Purchaser.**    At the Closing, Purchaser shall deliver to Seller a duly executed copy of the Bill of Sale and Assignment Agreement; and shall provide to the Seller the aggregate amount of the Purchase Price, against a lawful tax invoice issued by the Seller.

**Section 3.4    Termination of Agreement.**    This Agreement may be terminated prior to the Closing Date only as follows:

(a)    At any time prior to the Closing Date by the joint written consent of Seller and Purchaser;

(b)    By Purchaser if the Closing has not occurred on or before March 31, 2014, if so confirmed in a written instrument executed by Purchaser;

(c)    By Purchaser if the Israeli Court or any other governmental authority enters an order or makes a ruling or takes any other action that otherwise prevents the consummation of the transactions contemplated herein on the terms and conditions set forth in this Agreement or prevents the parties to the U.S. APA from consummating the transactions therein;

(d)    By Purchaser, upon a material breach of any covenant or agreement of Seller set forth in this Agreement, or if any material representation or warranty of Seller shall have been or becomes untrue (unless, in both cases, cured by the Seller within 10 days commencing on the

5

notice provided by the Purchaser to the Seller and specifying such material breach), or upon any termination of the U.S. APA prior to the closing thereof;

(e)     By Purchaser, if the Israeli Court's Order entered by the Israeli Court with Purchaser's consent is modified in any manner materially adverse to Purchaser, without the prior written consent of Purchaser (which consent may be withheld in Purchaser's sole discretion).

**Section 3.5     Effect of Termination.** No termination of this Agreement pursuant to Section 3.4 shall be effective until notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made.

## ARTICLE IV – REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller, through the Temporary Liquidator, hereby represents and warrants to the Purchaser as follows:

**Section 4.1     The Seller.**     On 11.27.2013, the Israeli Court appointed Attorney Lior Dagan in the capacity of Temporary Liquidator of the Seller.

**Section 4.2     The Israeli Court.**     The Israeli Court is supervising the procedures of the Seller's liquidation.

**Section 4.3     Organization.**     To the best knowledge of the Temporary Liquidator, prior to the appointment of the Temporary Liquidator, Seller conducted its business in the ordinary course and has the requisite power and authority to own, lease and operate the Purchased Assets and to carry the Business.

**Section 4.4     Authorization of Agreement.**     Subject to the entry of the Israeli Court's Order and in accordance with its terms, Seller, through the Temporary Liquidator, has all requisite power, authority and legal capacity to execute and deliver this Agreement and each other document, agreement, instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform its respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.     This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Israeli Court's Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms.

**Section 4.4     Title to and Sufficiency of Purchased Assets.**     Seller owns each of the Purchased Assets, and at the Closing, Purchaser will be vested with good and valid title to such Purchased Assets, free and clear of all Interests, to the fullest extent permissible under applicable laws. To the best knowledge of the Seller, other than the Purchased Assets and the assets purchased by the Purchaser under the U.S. APA, the Seller does not have any assets necessary for Purchaser to conduct the Business as it has been conducted by Seller prior to the appointment of the Temporary Liquidator.

6

**Section 4.5    Litigation.**    To the best knowledge of the Seller, except for **(a)** Seller's liquidation matters before the Israeli Court involving Seller or any of its Affiliates, and any matters that will otherwise be resolved by the Israeli Court's Order without any Liability or restriction applicable to Purchaser or the Purchased Assets and (b) the Bankruptcy Court proceedings related to the Parent, Seller is not involved in and has not been notified of any legal proceedings pending or threatened against Seller or any of its Affiliates, or relating to the Business or any of the Purchased Assets, before any governmental authority.

**Section 4.6    Grants.**    Exhibit C attached hereto provides a complete list of all pending and outstanding grants, incentives and subsidies, and applications thereof with respect to the Purchased Assets (collectively, "Grants") from the government of the State of Israel or any agency thereof, or from any foreign governmental or administrative agency, granted to the Seller including, without limitation, grants from the OCS.

**Section 4.7    No Other Representations or Warranties; Schedules**.    Except for the representations and warranties contained in this Article IV, neither Seller nor any other Person makes any express or implied representation or warranty with respect to Seller, the Business, the Purchased Assets, or the transactions contemplated by this Agreement. "Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

Subject to the foregoing representations and warranties, the Purchaser specifically acknowledges and agrees that the Purchased Assets are being sold in an "AS IS" "WHERE IS" condition as of the Closing Date and that except as expressly set forth in this Agreement, no representations or warranties have been made or are made and no responsibility has been or is assumed by any of the Seller or by any shareholder, officer, director, person, firm, agent, or representative acting or purporting to act on behalf of the Seller, including the Temporary Liquidator as to any matters concerning the Seller, Business and/or the Purchased Assets, or any condition which has or might affect the same or any portion thereof.

The Purchaser is not relying on any statement or representation by the Seller unless such statement, representation, covenant or warranty is specifically embodied in this Agreement.

Purchaser hereby irrevocably waives any claim, demand or contention against the Seller and/or the Temporary Liquidator and/or anyone acting on their behalf in connection with any matter directly or indirectly relating to the transaction contemplated under this Agreement, except that such waiver shall not apply to (i) Seller and the Temporary Liquidator's express obligations and covenants set forth in this Agreement, including without limitation, in connection with consummating the Closing and remitting payment of the OCS Fee and any Excess Transfer Fee to the OCS, or (ii) any fraud, intentional misrepresentation or willful misconduct.

## ARTICLE V – REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

7

**Section 5.1**     **Organization and Good Standing**.  Purchaser is an entity registered under the laws of Delaware, validly existing, in good standing and duly qualified to transact business under the laws of Delaware and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

**Section 5.2**     **Authorization of Agreement**.  Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

## ARTICLE VI – COVENANTS

**Section 6.1**     **Access to Information**.  Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives, to (a) make such investigation of the properties, businesses and operations of the Business and (b) make such examination of the books and records of the Business and the Purchased Assets as Purchaser reasonably requests and to make extracts and copies of such books and records. Seller shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller to cooperate fully with such representatives in connection with such review and examination.

**Section 6.2**     **Conduct of the Business Pending the Closing.**  Prior to the Closing, (a) Seller shall: maintain the Purchased Assets in their current condition, ordinary wear and tear excepted; and comply with applicable laws, and (b) Seller shall not take any action that would have an adverse effect on the ability of Seller to consummate the transactions contemplated herein or otherwise affect the Business or the value, utility or transferability of the Purchased Assets.

**Section 6.3**     **Appropriate Action; Filings.**  Through the Closing Date, Seller and Purchaser shall cooperate with each other and use (and shall cause their respective Affiliates to use) commercially reasonable efforts:  (i) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under this Agreement, applicable law or otherwise to consummate and make effective the Transactions, including obtaining all consents and approvals required to consummate the transactions contemplated herein, (ii) to obtain promptly from any governmental authority any orders or permits required to be obtained by Seller or Purchaser or any of their respective Affiliates in connection with the authorization, execution, delivery and performance of this Agreement and

8

the consummation of the Transactions, (iii) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the Transactions required under any applicable law, and (iv) to provide prompt notification to the other Party of any actions pursuant to clauses (i) – (iii) of this Section 6.3.

**Section 6.4    Confidentiality.**  Seller acknowledges that from and after the Closing, all non-public information relating to the Business, including, but not limited to the Purchased Assets, will be valuable and proprietary to Purchaser and its Affiliates.  Seller agrees that, from and after the Closing, Seller will not disclose to any Person any non-public information relating to Purchaser and its Affiliates, or the Business, including but not limited to the Purchased Assets, except as required by any applicable law or as otherwise becomes available in the public domain other than through any action by Seller in violation of its obligations under this Section 6.4.  In addition, Seller shall not issue any press release or public announcement concerning this Agreement or the Transactions, or otherwise disclose same, without obtaining the prior written approval of Purchaser, unless and only to the extent disclosure is otherwise required by applicable law or by the Israeli Court. The provisions of this Section 6.4 shall survive the Closing.

## ARTICLE VII – TAX MATTERS

**Section 7.1    Transfer Taxes; Withholding.**  Each Party will bear its own taxes associated with the transaction contemplated under this Agreement, as required under applicable law. Subject to an issuance of a certificate by the Israel Tax Authority, approving  the Seller's exemption from withholding tax at source, it is explicitly agreed and acknowledged that Purchaser shall not be entitled to withhold any tax at source.

## ARTICLE VIII– CONDITIONS TO CLOSING

**Section 8.1    Conditions Precedent to Obligations of Purchaser.**    The obligation of Purchaser to consummate the transactions contemplated by this Agreement at the Closing is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser, in its sole discretion, in whole or in part to the extent permitted by applicable law): (a) the representations and warranties of Seller set forth herein shall be true and correct at and as of the Closing; (b) Seller shall have performed all of its obligations hereunder, and (c) the U.S. APA shall remain effective and the Bankruptcy Court shall have issued the Bankruptcy Sale Order.

**Section 8.2    Conditions Precedent to Obligations of Purchaser and Seller.**  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement at the Closing are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable law): (a) there shall not be in effect any law or order by a governmental authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated herein; and (b) the Israeli Court shall have issued the Israeli Court's Order approving this Agreement, and such order shall be in full force and effect and shall have become a final order without amendment or modification.

9

**Section 8.3**    **Frustration of Closing Conditions**.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 8.1 or Section 8.2, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE IX – MISCELLANEOUS

**Section 9.1**    **Survival of Representations, Warranties, Covenants and Agreements**.  Except with respect to covenants or agreements which are to be performed on or prior to the Closing, all covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms.

**Section 9.2**    **Injunctive Relief; Specific Performance.**    The Parties hereto agree that irreparable harm would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms on a timely basis or were otherwise breached.  It is accordingly agreed that the Parties hereto shall be entitled to injunctive or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.3**    **Expenses**.  Except as otherwise set forth in this Agreement, each Party shall bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated hereby and the consummation of the transactions contemplated hereby and thereby.

**Section 9.4**    **Submission to Jurisdiction.**  The resolution of any and all disputes between the Parties herein concerning the Purchased Assets or this Agreement, shall be subject to the exclusive jurisdiction of the competent Israeli Court.

**Section 9.5**    **Time of Essence**.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**Section 9.6**    **Entire Agreement; Amendments and Waivers**.  This Agreement (including the Schedules and Exhibits hereto) and the other documents entered into among the Parties in connection with the transactions contemplated herein represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof, including the Letter of Intent.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

**Section 9.7**    **Governing Law**.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Israel, without reference to conflict of law principles to the contrary.

**Section 9.8**    **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (i) when delivered personally or by prepaid overnight courier, with a record of receipt, (ii) the fourth day after mailing if mailed by certified mail,

10

return receipt requested, or (iii) the day of transmission, if sent by facsimile or telecopy during regular business hours or the business day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the Parties at the following addresses or facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Parties pursuant to this Section 9.8):

    If to Seller:

        Transwitch (Israel) LTD (Under Temporary Liquidation)
        By Lior Dagan, ADV., Temporary Liquidator
        1 Azrieli Center (Round Tower, 41st floor)
        Tel-Aviv, Israel 6701101
        Tel: 00-972-3-6070800
        Fax: 00-972-3-6097797
        Attention: Lior Dagan

    If to Purchaser:

        Cadence Design Systems, Inc.
        2655 Seely Avenue, Building 5
        San Jose, CA 95134
        Fax: (408) 428-5455
        Attention: Office of the General Counsel

    With a copy to:

        Gibson, Dunn & Crutcher LLP
        200 Park Avenue
        New York, NY 10166-0193
        Tel: 212.351.2615
        Fax: 212.351.6351
        Attention: Matthew Kelsey

        and

        Herzog Fox & Neeman
        4 Weizmann Street
        Tel Aviv, Israel
        Tel: +972-3-692-2020
        Fax: +972-3-6966464
        Attention: Hanan Haviv

**Section 9.9**    **Severability**. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by applicable law or public policy, all other terms and provisions hereof shall nevertheless remain in full force and effect so long as the legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party. Upon such determination that any term or provision is invalid, illegal or incapable of

being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

**Section 9.10  Binding Effect; Assignment.**  This Agreement shall be binding solely upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a Party to this Agreement. Purchaser may assign this Agreement and any or all rights or obligations hereunder to one or more other Persons, whether or not an Affiliate of Purchaser, *provided however*, that if the Purchaser makes any such assignment prior to the Closing, then the Purchaser shall provide the Seller with prior written notice specifying such assignment. Seller shall have no right to assign this Agreement or the rights hereunder without the express written consent of Purchaser, and any attempted assignment in violation of this clause will be null and void.

**Section 9.11  Counterparts.**  This Agreement may be executed and delivered (including by electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

12

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

**TRANSWITCH (ISRAEL) LTD. (IN TEMPORARY LIQUIDATION)**

By: _____

      Name: Lior Dagan
      Title: Temporary Liquidator

**CADENCE DESIGN SYSTEMS, INC.**

By: _____

      Name: Martin Lund
      Title: Senior Vice President, IP Group

[*Signature Page to Israel Asset Purchase Agreement*]

## EXHIBIT A

### Purchased Assets

1. Seller's Intellectual Property related to the Business, including agreements under which Seller licenses Intellectual Property from its Affiliates, but excluding the Excluded Assets (the "Purchased Intellectual Property");

2. All other tangible personal property owned by Seller related to, useful in or held for use in the conduct of the Business, including equipment, computers (including data contained thereon), software disks and documentation, computer storage (including hard drives), machines, hardware, electronics, file servers relating to or available for sale or use in connection with the Business;

3. The Purchased Intellectual Property, together with any claims or causes of action with respect to infringement, misappropriation or dilution of any of the Purchased Intellectual Property;

4. All documents and records relating to the Business and that are used in, held for use in or intended to be used in, or that arise primarily out of, the Purchased Intellectual Property or otherwise out of the Business;

5. All rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof); and

6. All other assets, properties, rights and claims of Seller of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business, or which relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described herein.

For purposes of this Agreement, "Intellectual Property" means all worldwide intellectual property and rights arising from or in respect of the following: all (i) patents, patent applications (including provisional and Patent Cooperation Treaty applications), patent disclosures and all related continuations, divisionals, continuations-in-part, reexaminations and reissues, extensions, renewals, and counterparts thereof, all industrial designs, industrial models and utility models, certificates of invention, as well as rights to file for, and to claim priority to, any such patent rights (collectively, "Patents"); (ii) trademarks, service marks, certification marks, collective marks, trade names, business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols, Internet domain names and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing (collectively, "Marks"); (iii) published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information, computer software, source code, object code, algorithms, and other similar materials and Internet website content), copyrights, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"); (iv) inventions, developments, discoveries and concepts (whether or no patentable and whether or not reduced to practice), systems, confidential and proprietary information, technical information, data, technical plans, compilations, technical plans, production and manufacturing processes and techniques, trade secrets, and know-how, including methods and/or materials, processes, procedures, business plans, schematics, specifications, software and databases (including source code, object code and algorithms), formulae, drawings, illustrations, prototypes, models, designs, devices, technology, research and development and customer information and lists (collectively, "Trade Secrets"); (v) all other proprietary rights relating to any of the foregoing, (vi) copies and tangible embodiments thereof (in whatever form or medium); and (vii) rights to sue or recover for past, present or future infringements, misappropriations, dilution, unauthorized use or disclosure, or other conflict with any of the foregoing intellectual property.

## **EXHIBIT B**

Form of Bill of Sale and Assignment Agreement

*Attached*

## EXHIBIT B

### FORM OF
### BILL OF SALE AND ASSIGNMENT AGREEMENT

**THIS BILL OF SALE AND ASSIGNMENT AGREEMENT** (this "Agreement") is made as of January ___, 2014, by TranSwitch (Israel) Ltd (in temporary liquidation), an Israeli company ("Seller" or "Assignor"), in favor and for the benefit of each of Cadence Design Systems (Ireland) Limited ("Cadence Ireland" or "Assignee") and Cadence Design (Israel) II Ltd. ("Cadence Israel" or "Purchaser", and together with Cadence Ireland, the "Cadence Affiliates"), pursuant to that certain Asset Purchase Agreement, dated as of January 14, 2014 (the "Purchase Agreement"), by and between Seller and Cadence Design Systems, Inc., a Delaware corporation and parent company of the Cadence Affiliates ("Cadence"). Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

### W I T N E S S E T H:

WHEREAS, the Purchase Agreement provides for, among other things, the sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Purchaser, or one or more of its affiliates or designees, for the consideration and on the terms and conditions set forth in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, Assignor desires to transfer and assign to Cadence Ireland, as Assignee, and Cadence Ireland desires to acquire all of Assignor's right, title, and interest in and to all of the Purchased Intellectual Property listed on Schedule I hereto, together with the goodwill pertaining thereto (collectively, the "Assigned Intellectual Property");

WHEREAS, pursuant to the Purchase Agreement, Seller desires to sell, transfer and deliver to Cadence Israel, as Purchaser, and Cadence Israel desires to purchase and acquire all of Assignor's right, title, and interest in and to the Purchased Assets listed on Schedule II hereto (collectively, the "Tangible Purchased Assets"); and

WHEREAS, the parties desire to carry out the intent and purpose of the Purchase Agreement by the execution and delivery of this Agreement evidencing the vesting in Cadence Ireland, as Assignee, and Cadence Israel, as Purchaser, of all of Seller's right, title and interest in and to the Purchased Assets and to the Assigned Intellectual Property, in accordance with the terms set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises, the covenants and agreements contained in the Purchase Agreement and in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to implement the assignments of Intellectual Property required by the Agreement, the parties hereto agree as follows:

1.      Assignor does hereby sell, transfer, convey, assign, grant, set over and deliver to Assignee, and Assignee hereby accepts, all of Assignor's right, title, and interest in and to the

1

Assigned Intellectual Property, free and clear of all liens, mortgages, options, charges, title defects, security interests and similar encumbrances, the same to be held by Assignee for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns, designees, nominees and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Agreement had not been made, together with all causes of action (in law or equity), claims, demands and any other rights for, or arising from any past, present or future infringement, of the Assigned Intellectual Property, along with the right to sue for and collect any damages for the use and benefit of Assignee and Assignee's successors, assigns, designees, nominees and other legal representatives, all in accordance with the terms of the Purchase Agreement .

2.     Assignor hereby authorizes and requests the Israel Patent Office, and any officer of any country or countries foreign to the State of Israel, whose duty it is to issue, certify, or assign registrations or applications for service marks, trademarks, patents, copyrights, Internet domain names or other evidence or forms of intellectual property protection, to issue, certify or assign as appropriate, the same to Assignee and Assignee's successors, assigns, designees, nominees and other legal representatives in accordance with the terms of this Agreement.

3.     Seller hereby sells, assigns, grants, transfers, releases, conveys, delivers and vests in the Purchaser, its successors and assigns forever, all of Seller's right, title and interest in and to the properties and assets, tangible, comprising the Purchased Assets, certain of which are listed in Schedule II hereto.

4.     The Seller hereby constitutes and appoints the Purchaser, its successors and assigns, as the Seller's true and lawful attorney, with full power of substitution, in the Seller's name and stead, on behalf of and for the benefit of the Purchaser, its successors and assigns, to demand and receive any and all of the Purchased Assets and to give receipts and releases for and in respect of the Purchased Assets, or any part thereof, and from time to time to institute and prosecute in the Seller's name, at the sole expense and for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser, its successors and assigns, reasonably may require for the collection or reduction to possession of any of the Purchased Assets. The Seller hereby declares that the foregoing powers are coupled with an interest and are and shall be irrevocable and, accordingly, may not be revoked by Seller in any manner or for any reason whatsoever.

5.     This Agreement is executed and delivered pursuant to the Purchase Agreement and in all respects is subject to the covenants, representations, warranties and other provisions thereof and shall be governed entirely in accordance with the terms and conditions of the Purchase Agreement, and shall be construed consistently therewith.  No provision set forth in this Agreement shall be deemed to enlarge, alter, modify or amend the terms or provisions of the Purchase Agreement or other documents referred to therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

[Remainder Page Intentionally Left Blank]

**IN WITNESS WHEREOF,** the undersigned have caused this Bill of Sale and Assignment Agreement to be duly executed as of the date first set forth above.

**SELLER / ASSIGNOR:**

**TRANSWITCH (ISRAEL) LTD. (IN TEMPORARY LIQUIDATION)**

By: _____

Name:
Title:

**AGREED AND ACCEPTED:**

**CADENCE DESIGN SYSTEMS (IRELAND) LIMITED, AS ASSIGNEE**

By: _____

Name:
Title:

**CADENCE DESIGN (ISRAEL) II LTD., AS PURCHASER**

By: _____

Name:
Title:

*[Signature Page to Israel Bill of Sale and Assignment Agreement]*

## SCHEDULE I

**Assigned Intellectual Property**

[To be provided]

## SCHEDULE II

**Tangible Purchased Assets**

[To be provided]

## EXHIBIT C

Grants

*Attached*

**Grants**
**Received ($)**
**According to Repayment**

| File # | Project | Year | Project Subject | the OCS | % | Project Scope |
|--------|---------|------|-----------------|---------|---|---------------|
| 26204 | 26204 | 2000 | GIGABIT PHY | 1,007,443 | | 100% Gigabit –cu PHY |
| 27134 | 26204 | 2001 | Advanced component for LAN 10/100/1000 Mbps. GIGABIT-CU Ethernet | 1,612,013 | | 100% 1Gb.PHY of Ethernet LAN for CU |
| 28184 | 26204 | 2002 | Physical Layer Device | 450,547 | | 120% Gigabit-cu Ethernet Physical Layer device for |
| | | | | 3,070,003 | | |